*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ROSALIND M., | ) |
| | ) Supreme Court No. S-18683 |
| Intervenor- | ) |
| Appellant, | ) Superior Court No. 3DI-20-00014 CN |
| | ) |
| v. | ) O P I N I O N |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) No. 7718 – September 6, 2024 |
| OF FAMILY & COMMUNITY | ) |
| SERVICES, OFFICE OF | ) |
| CHILDREN'S SERVICES; and | ) |
| INGRID A. (Mother); | ) |
| | ) |
| Appellees, | ) |
| | ) |
| and | ) |
| | ) |
| TOGIAK TRADITIONAL COUNCIL, | ) |
| | ) |
| Intervenor- | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Dillingham, Christina Reigh, Judge.

Appearances: Darryl L. Jones, Law Office of Darryl L. Jones, Palmer, for Appellants. Robert Kutchin, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee State of Alaska. Renee McFarland, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellee Ingrid A. Rebecca Patterson and Chloe Cotton, Sonosky, Chambers, Sachse, Miller & Monkman, LLP, Anchorage, for Intervenor-Appellee Togiak Traditional Council.

Before: Carney, Borghesan, Henderson, and Pate, Justices.
[Maassen, Chief Justice, not participating.]

BORGHESAN, Justice.
CARNEY, Justice, concurring.

## I. INTRODUCTION

Under the Indian Child Welfare Act (ICWA), an Indian child's tribe may petition to transfer certain child custody proceedings in superior court to the tribe's jurisdiction. The superior court may deny transfer of jurisdiction only if a parent objects or for "good cause."[1] Binding federal regulations prohibit the superior court from considering "[w]hether transfer could affect the placement of the child" when deciding whether there is good cause to deny transfer.[2]

In this child in need of aid (CINA) proceeding, the child's tribe petitioned the superior court to transfer jurisdiction. The child's foster parents then moved to intervene in the proceedings. The foster parents cited our decision in *State, Department of Health & Social Services, Office of Children's Services v. Zander B.*, which held that in "rare case[s]" in which foster parents have "relevant evidence" that the court is "not likely to receive from the existing parties," the court may permit foster parents to intervene.[3] The foster parents here argued that the tribe was likely to place the child with his grandmother, who would not be able to meet the child's health needs, putting him at risk of harm. Asserting that no party was likely to present this evidence to the court, the foster parents sought leave to intervene so as to oppose transfer of jurisdiction to the tribe.

---

[1] 25 U.S.C. § 1911(b).

[2] 25 C.F.R. § 23.118(c)(3) (2023).

[3] 474 P.3d 1153, 1171 (Alaska 2020) (emphasis omitted), *overruled on other grounds by Blythe P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 524 P.3d 238 (Alaska 2023).

The superior court denied the motion to intervene. We affirmed its decision in a summary order and now explain our decision. The foster parents' arguments against transfer of jurisdiction were directly contrary to federal law. The superior court cannot deny transfer based on concerns that the tribe receiving jurisdiction might change the child's placement. Because the foster parents presented no valid grounds to deny transfer of jurisdiction, they did not share any issue of law or fact in common with the underlying proceedings that would justify their intervention.

## II.   FACTS AND PROCEEDINGS

Ingrid A. and Josh D. are the parents of Evan D.[4] Evan's parents are both members of the Native Village of Togiak (the "Tribe"), and Evan is eligible for membership in the Tribe. He is therefore an Indian child for the purposes of ICWA, which applies to this case.[5]

A few days after Evan's birth in September 2020, the Office of Children's Services (OCS) filed an emergency petition to adjudicate Evan a child in need of aid and give OCS temporary custody. The petition cited the parents' history with OCS and raised concerns of neglect, untreated substance abuse, and domestic violence.

Ingrid reported using alcohol, heroin, and buprenorphine during her pregnancy. Evan was born with considerable health complications, including respiratory impairments. Four days after Evan's birth, OCS placed him in the care of foster parents Rosalind and Max M. Rosalind and Max lived near a medical facility that could care for Evan's needs. Rosalind is a member of a different Indian tribe than Evan's parents.

---

[4]     We use pseudonyms in this opinion to preserve the parties' privacy.

[5]     ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

OCS informed the Tribe of the CINA proceeding in October 2020. In December the superior court held a hearing and entered an order granting temporary custody to OCS; Evan remained in the same foster home. In May 2021 the superior court adjudicated Evan a child in need of aid, and in August the superior court ordered that he remain in the temporary custody of OCS. OCS allowed the foster parents to continue as Evan's temporary placement.

In June 2022 OCS petitioned to terminate Ingrid's and Josh's parental rights. Shortly after, the Tribe petitioned for transfer of jurisdiction over Evan's case.

Three days later, Rosalind and Max moved to intervene, arguing that our decision in *Zander B.* allowed them to join the case. Rosalind provided an affidavit in which she described Evan's dependence on nearby medical care, her bonding with Evan, the lack of effort by Evan's biological family to engage in visitation, and her belief that Evan's grandmother would be an inadequate caregiver. The foster parents argued that placing Evan with the grandmother, who lived in Togiak, would put Evan at risk due to the lack of nearby medical facilities.

Rosalind's affidavit described in detail Evan's significant health complications. She explained how Evan's respiratory issues can lead to a drop in oxygen levels within minutes, requiring immediate treatment. She warned that sustained low oxygen levels as a result of delayed treatment can lead to lifelong neurological and cognitive damage. She explained that during episodes of high risk, which can last three to four days, Evan requires hourly breathing treatments and 24-hour supervision by an attentive person. Rosalind reported that Evan had visited the emergency room six times in the preceding year on account of his respiratory issues. She credited her own medical training and the medical resources in her community for helping to keep Evan alive.

OCS opposed the foster parents' motion to intervene, arguing that their motion failed under *Zander B.* and federal law. OCS observed that federal law prohibits consideration of potential placement when determining if good cause exists to deny

transfer. Since the foster parents' evidence concerned how placement in Togiak would affect Evan, OCS argued that the superior court could not rely on it to deny transfer.

The foster parents submitted more evidence with their reply. They attached letters from Evan's doctor and other individuals describing Evan's bonding with the foster parents and the consequences that could follow from a change in placement. They attached a text exchange with Josh discussing the number of children under Evan's grandmother's care and an email exchange with an OCS caseworker offering to discuss transition in the event that the Tribe ordered a change in Evan's placement. Rosalind added a second affidavit in which she reiterated many of her previous concerns. Her affidavit additionally asserted that she had been "privy to first-hand conversations and meeting[s] regarding the intention of OCS to transfer jurisdiction" to the Tribe. Rosalind also alleged that the grandmother had invited Josh, who had felony and domestic violence convictions, to reside in Togiak in exchange for his agreement to allow the Tribe to receive jurisdiction.

The superior court denied the foster parents' motion to intervene. The court reasoned that the foster parents' "objection to the transfer to tribal court jurisdiction stem[med] from their objection to a prospective change in placement." Because "[b]inding federal regulation prohibits the state court from considering placement when deciding whether to transfer jurisdiction," the superior court determined that it could not take the foster parents' evidence into account. Because the foster parents did not otherwise provide "specific, relevant information that addresses jurisdiction," the superior court concluded that "neither [Alaska] Civil Rule 24 nor *Zander B.* authorize[d] intervention as a party."

The foster parents moved for reconsideration. They argued that *Zander B.* gave the superior court "broad discretion to allow intervention." They also asserted that ICWA's "good cause" exception allows state courts to consider the best interests of the child when deciding whether to transfer jurisdiction.

While the motion to reconsider was pending before the superior court, the foster parents submitted more evidence. They attached a document indicating that a man whom the foster parents alleged is the maternal grandmother's husband had been previously convicted of both a domestic-violence-related misdemeanor and a felony for distribution of indecent materials to minors. They alleged that this person was a registered sex offender.

The superior court denied the motion for reconsideration. The court reiterated its previous ruling that the foster parents' claim and the main action did not share "a question of law or fact in common," a necessary criterion for intervention. The court reasoned that "[g]ood cause may not be based on a potential change of placement because the court is not permitted to even consider whether the transfer to the tribal court will affect the child's placement." The superior court also stated two additional grounds for denying permissive intervention: (1) it would cause undue delay and prejudice the original parties; and (2) it would not serve Evan's best interests.

In January 2023 the Tribe indicated that it would accept transfer of jurisdiction. Neither of the biological parents opposed transfer. But the superior court ultimately stayed the transfer order pending the foster parents' appeal in order to preserve state court jurisdiction in the event we reversed the order denying intervention.[6]

On September 13, 2023, we entered an order summarily affirming the superior court. This opinion explains our reasoning.

---

[6] *See J.P. v. State*, 506 P.3d 3, 4 (Alaska 2022) (holding that we lacked authority to "order the court of [a tribe], a separate sovereign, to transfer jurisdiction of [a] child's proceeding back to state court" following a valid transfer of jurisdiction).

## III. STANDARD OF REVIEW

"We review the denial of a motion for permissive intervention using the abuse of discretion standard."[7] "A decision constitutes an abuse of discretion if it is arbitrary, capricious, manifestly unreasonable, or . . . stems from an improper motive."[8] "We review whether a trial court's findings satisfy the statutory requirements of the CINA and ICWA statutes de novo."[9]

## IV. DISCUSSION

Rosalind and Max make two arguments on appeal. First, they argue that the superior court abused its discretion by rejecting their motion to intervene under Civil Rule 24 and *Zander B.* Second, they argue for the first time on appeal that Rosalind is an Indian custodian with a right to intervene under ICWA. We reject both arguments. We then address how the superior court should approach a request for stay pending appeal in these circumstances.

### A. The Superior Court Did Not Abuse Its Discretion By Rejecting Permissive Intervention.

The superior court correctly concluded that the foster parents did not meet the criteria for permissive intervention. A party seeking to intervene must share a "question of law or fact in common" with the existing parties to the proceeding.[10] The foster parents argued that their evidence was relevant to the question of the child's best interests. But the superior court correctly recognized that their arguments and evidence were not permissible considerations in deciding whether to transfer jurisdiction to the child's tribe. Because the sole question before the court was whether to transfer

---

[7] *Neese v. State*, 218 P.3d 983, 987 (Alaska), *as amended on reh'g* (Nov. 20, 2009).

[8] *Zander B.*, 474 P.3d at 1162 (alteration in original) (quoting *del Rosario v. Clare*, 378 P.3d 380, 383).

[9] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Child.'s Servs.*, 244 P.3d 1099, 1111 (Alaska 2010).

[10] Alaska R. Civ. P. 24(b), *quoted in Zander B.*, 474 P.3d at 1163.

jurisdiction, and the foster parents' evidence and argument could not be considered in deciding that question, the court properly denied intervention.

In *Zander B.* we recognized that, under some rare circumstances, foster parents may be permitted to intervene in their foster child's CINA proceedings.[11]  To qualify for intervention, foster parents must meet the criteria for permissive intervention under Civil Rule 24.[12]  They must show that their "claim or defense and the main action have a question of law or fact in common."[13]  And they must show that their intervention will not "unduly delay or prejudice" the rights of the existing parties.[14]  But we cautioned that foster parent intervention is only appropriate in the "rare case in which the trial court reasonably decides that foster parents have *relevant* evidence it is not likely to receive from the existing parties."[15]

A basic difference between *Zander B.* and this case is the underlying issue on which the foster parents seek intervention.  The issue before the court in *Zander B.* was placement.[16]  The foster parents opposed OCS's proposal to transfer the child from their care to the care of his grandmother.[17]  We reasoned that because the foster parents sought to adopt the child, "their claim did share a 'question of law or fact' with the placement review:  the child's best interests."[18]  And because the foster parents possessed evidence about the proposed change of placement that the court would not hear from any other party, we held that the superior court did not abuse its discretion

---

[11]  *Zander B.*, 474 P.3d at 1171.

[12]  *Id.* at 1162-64.

[13]  Alaska R. Civ. P. 24(b), *quoted in Zander B.*, 474 P.3d at 1163.

[14]  *Id.*

[15]  *Zander B.*, 474 P.3d at 1171 (emphasis in original).

[16]  *See id.* at 1164-65.

[17]  *Id.* at 1157.

[18]  *Id.* at 1164.

by permitting them to intervene "for the limited purpose" of challenging OCS's placement decision.[19]

The issue facing the superior court in this case was whether to transfer jurisdiction of the child's case to his Tribe. The court could deny the Tribe's petition to transfer jurisdiction only for "good cause."[20] Determining whether the foster parents in this case shared a question of law or fact in common with the existing parties depends on the meaning of the "good cause" exception. To understand the scope of this exception, and whether the foster parents presented relevant information on the question, it is essential to recognize the history underlying ICWA and the policy behind its jurisdictional provisions.

Congress enacted ICWA in 1978 out of concern that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions."[21] Congress highlighted the role that state courts played in this process, concluding that state courts "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."[22]

ICWA's jurisdictional provisions are a direct response to these failures. Congress gave Indian tribes exclusive jurisdiction to determine the welfare of any Indian child domiciled on the reservation of the child's tribe.[23] For Indian children not domiciled on their tribe's reservation, ICWA requires that a state court grant a parent's

---

[19]     *Id.* at 1164-65.

[20]     25 U.S.C. § 1911(b).

[21]     *Id.* § 1901(4).

[22]     *Id.* § 1901(5).

[23]     *Id.* § 1911(a).

or tribe's petition to transfer jurisdiction to the Indian child's tribe absent good cause.[24] This latter rule " 'creates concurrent but *presumptively tribal* jurisdiction' over proceedings involving children not domiciled on reservations."[25]

These jurisdictional rules "presume[] both that the tribes . . . are capable of adjudicating child custody matters . . . and that tribal justice systems are appropriate forums for resolution of child custody disputes."[26] "Indeed, legislative history reveals that ICWA's jurisdictional framework was motivated by concerns over the 'failure of State officials, agencies, and procedures to take into account the special problems and circumstances of Indian families *and the legitimate interest of the Indian tribe in preserving and protecting the Indian family as the wellspring of its own future.*' "[27] These jurisdictional provisions, along with the limitations on state court jurisdiction over child custody proceedings, "lie [a]t the heart of the ICWA."[28]

This history, and these federal policies, inform how a court must decide whether there is good cause to deny a petition to transfer jurisdiction to an Indian child's tribe. Although ICWA itself does not define what constitutes "good cause" to deny a transfer petition, in 2016 the Bureau of Indian Affairs (BIA) enacted binding regulations to guide state courts in this determination.[29] The regulations expressly prohibit state courts from considering certain factors when deciding whether good cause exists to

---

[24]    *Id.* § 1911(b).

[25]    *In re C.R.H.*, 29 P.3d 849, 853 n.16 (Alaska 2001) (emphasis in original) (quoting *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989)).

[26]    *State v. Native Vill. of Tanana*, 249 P.3d 734, 750 (Alaska 2011) (ellipses in original) (quoting *John v. Baker*, 982 P.2d 738, 753 (Alaska 1999)).

[27]    *John*, 982 P.2d at 753-54 (emphasis in original) (quoting H.R. REP. NO. 95-1386, at 19 (1978)).

[28]    *Simmonds v. Parks*, 329 P.3d 995, 1009 (Alaska 2014) (internal quotation marks omitted) (quoting *Holyfield*, 490 U.S. at 36).

[29]    *See* 25 C.F.R. § 23.118(c) (2023).

deny a transfer petition.[30] These prohibited factors include "[w]hether transfer could affect the placement of the child."[31]

The BIA has also published nonbinding guidelines (the Guidelines) that elaborate on the good cause exception.[32] According to the Guidelines, the good cause determination "should address which court is best positioned to adjudicate the child-custody proceeding, not predictions about the outcome of that proceeding."[33] The Guidelines instruct that the analysis should operate as a "modified doctrine of forum non conveniens . . . to insure that the rights of the child as an Indian, the Indian parents or custodian, and the Tribe are fully protected."[34] Although "[s]tate courts may exercise case-by-case discretion regarding the 'good cause' finding, . . . this discretion should be limited and animated by the Federal policy to protect the rights of the Indian child, parents, and Tribe, which can often best be accomplished in Tribal court."[35]

The Guidelines also note that state courts have in the past used the good-cause exception "to deny transfer for reasons that frustrate the purposes of ICWA."[36] The BIA regulations sought to address this problem by prohibiting state courts from

---

[30]    *Id.*

[31]    *Id.*

[32]    U.S. DEP'T OF THE INTERIOR, BUREAU OF INDIAN AFFS., GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT (2016), https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf (hereinafter 2016 BIA GUIDELINES). We have previously recognized these Guidelines as "persuasive." *State v. Cissy A.*, 513 P.3d 999, 1009 (Alaska 2022).

[33]    2016 BIA GUIDELINES, *supra* note 32, at 49.

[34]    *Id.* at 48-49.

[35]    *Id.* at 49.

[36]    *Id.* at 48.

considering certain factors when deciding whether to transfer jurisdiction.[37] With respect to placement, the Guidelines reiterate that "whether the Tribal court could change the child's placement" is an inappropriate basis for finding good cause to deny a transfer petition.[38] The Guidelines note that state courts "cannot know or accurately predict which placement a Tribal court might consider or ultimately order" and that "Tribal courts and agencies seek to protect the welfare of the Indian child, and would consider whether the current placement best meets that goal."[39] In other words, the Guidelines instruct that a state court's prediction that a tribal court might make an ill-advised placement decision is not good cause to retain jurisdiction; deciding otherwise would "frustrate the purposes of ICWA."[40]

With this background in mind, we turn to the foster parents' arguments for intervention. The foster parents argue that the superior court may have "good cause" to deny the petition when transfer would not be in the best interests of the child. They argue that their evidence shows that transfer of jurisdiction would be harmful to Evan's best interests. Accordingly they claim to assert a question of fact or law in common with the underlying jurisdictional issue that meets *Zander B.*'s test for intervention.

Their reliance on *Zander B.* is misplaced. *Zander B.*, as explained above, involved a challenge to placement. When OCS makes a placement decision, and when the court reviews it, the child's best interests are a central concern.[41] The foster parents

---

[37] *Id.* at 49 (noting that 25 C.F.R. 23.118(c) "identifies a limited number of considerations that should not be part of the good-cause analysis because there is evidence Congress did not wish them to be considered, they have been shown to frustrate the purposes of ICWA, or would otherwise work a fundamental unfairness.").

[38] *Id.* at 50.

[39] *Id.*

[40] *Id.* at 48-51.

[41] *See* AS 47.10.080(s) (permitting OCS to "transfer a child, in the child's best interests, from one placement setting to another" and authorizing court to deny the

in *Zander B.* sought to adopt the child, so their "claim" shared the question of the child's best interests in common with the placement review.[42]

But the role that the child's best interests play in determining transfer is less straightforward. The foster parents cite several cases in which courts outside Alaska have considered a child's best interests in denying petitions to transfer jurisdiction to the child's tribe.[43] Yet all of these cases were decided *before* the BIA adopted regulations prohibiting courts from considering whether "transfer could affect the placement of the child."[44] Under current law, the degree to which a court may consider a child's best interests in weighing whether good cause exists to deny transfer is not clear. Perhaps the child's best interests may be considered insofar as they do not involve the child's placement. But we need not decide that question because in this case the foster parents' best-interests argument is based squarely on the assumption that the Tribe will change the child's placement. That consideration is expressly contrary to federal law.

---

proposed transfer if it is proved by clear and convincing evidence that it would "be contrary to the best interests of the child").

[42] *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Zander B.*, 474 P.3d 1153, 1164 (Alaska 2020).

[43] The appellants cite the following cases: *In re Maricopa Cnty. Juv. Action No. JS-8287*, 828 P.2d 1245, 1251 (Ariz. App. 1991); *In re Robert T.*, 246 Cal. Rptr. 168, 175 (Cal. App. 1988); *Crystal R. v. Superior Ct.*, 69 Cal. Rptr. 2d 414, 424 (Cal. App. 1997); *In re T.R.M.*, 525 N.E.2d 298, 308 (Ind. 1988); *In re P.E.M.*, No. 06-1895, 2007 WL 914185, at *3 (Iowa App. March 28, 2007); *In re B.M.*, 532 N.W.2d 504, 506-07 (Iowa App. 1995); *In re Child. of R.A.J.*, 769 N.W.2d 297, 304 (Minn. App. 2009); *In re J.W.C.*, 265 P.3d 1265, 1271 (Mont. 2011); *In re T.S.*, 801 P.2d 77, 80 (Mont. 1990); *In re M.E.M.*, 635 P.2d 1313, 1317 (Mont. 1981); *In re N.L.*, 754 P.2d 863, 869 (Okla. 1988); *In re Adoption of S.W.*, 41 P.3d 1003, 1010 (Okla. App. 2001); *Chester Cnty. Dep't of Soc. Servs. v. Coleman*, 372 S.E.2d 912, 915 (S.C. App. 1988); *In re J.J.*, 454 N.W.2d 317, 331 (S.D. 1990).

[44] *See* Indian Child Welfare Proceedings, 81 Fed. Reg. 38,778, 38,778, 38,872-73 (June 14, 2016), final rule codified at 25 C.F.R. § 23.118 (2023).

The foster parents' best-interests argument was premised on the belief that if the Tribe received jurisdiction, it would place Evan with his maternal grandmother. The foster parents presented evidence that placing Evan with his maternal grandmother would put him at risk of abuse, inadequate care, and psychological harm. They also presented evidence that it would be dangerous for Evan to live far away from a hospital. This evidence is relevant only if we presume that the Tribe will change Evan's placement. But binding federal regulations expressly prohibit state courts from considering "[w]hether transfer could affect the placement of the child" when deciding whether there is good cause to reject a tribe's petition for jurisdiction.[45]

The foster parents allege that the Tribe has already decided to place Evan with his biological grandmother, but their evidence does not change our conclusion. Rosalind provided the superior court an affidavit in which she claimed to be "privy to first-hand conversations and meeting[s] regarding the intention of OCS to transfer jurisdiction of this matter to the tribe for the purpose of placing [Evan] with the maternal grandmother." She also presented emails in which an OCS caseworker stated her belief that "the plan is for [Evan] to be placed with his maternal grandmother in Togiak once jurisdiction transfers." But OCS's intentions and the caseworker's belief about the Tribe's intentions are both immaterial. This evidence invited the superior court to guess whether the tribal court would place Evan with his grandmother — speculation that federal law forbids.

The BIA Guidelines indicate that Congress intended the "good cause" exception to operate like a modified doctrine of forum non conveniens.[46] This doctrine traditionally focuses on which forum is a more convenient stage for the litigation and

---

[45] 25 C.F.R. § 23.118(c)(3) (2023).

[46] 2016 BIA GUIDELINES, *supra* note 32, at 48-49.

not how a different court might decide the case.[47]  The foster parents presented no evidence as to why the state court was a more appropriate forum.[48]  The only evidence they presented was evidence the court could not consider in deciding the sole issue before it:  whether good cause existed to deny transfer.  Foster parent intervention is reserved for the "rare case" in which the "foster parents have *relevant* evidence" that the superior court "is not likely to receive from the existing parties."[49]  This is not that rare case.  Given the nature of the "good cause" exception, it is difficult to conceive of a situation in which it would be proper to permit foster parents to intervene to oppose transferring jurisdiction to tribal court.[50]

OCS takes the position that the superior court may consider, as good cause to deny transfer, "concrete evidence showing that transfer will likely put the child at imminent risk of serious harm."  OCS derives this interpretation from both traditional forum non conveniens analysis and the provisions of ICWA.  Under traditional forum non conveniens analysis, a court may consider whether the remedy provided by the

---

[47]  *See, e.g.*, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247 (1981) ("The possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the forum non conveniens inquiry."); *see also Bromley v. Mitchell*, 902 P.2d 797, 800 (Alaska 1995) (listing "five factors relevant to a forum non conveniens determination:  ease of access to proof, availability and cost of witnesses, the possibility that the forum was chosen to harass, the enforceability of the judgment, and the burden on the community of litigating matters not of local concern").

[48]  Rosalind did allege in an affidavit that Josh had told her that one of Ingrid's family members was a tribal leader and therefore had a conflict of interest.  But Rosalind does not raise this speculative assertion in her brief, so we do not address it.

[49]  *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Zander B.*, 474 P.3d 1153, 1171 (Alaska 2020) (emphasis in original), *overruled on other grounds by Blythe P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 524 P.3d 238 (Alaska 2023).

[50]  *Cf. id.* at 1170 (explaining that we could not "conceive of a situation in which foster parent intervention in a CINA case would be appropriate when the foster parents' purpose was to argue for the termination of parental rights").

alternate forum "is so clearly inadequate or unsatisfactory that it is no remedy at all."[51] ICWA provides that state authorities may take temporary custody of a child over whom a tribal court has exclusive jurisdiction "in order to prevent imminent physical damage or harm to the child."[52] And federal authorities explain that the BIA precluded state courts from considering whether transfer "could affect the placement of the child"[53] because they should not "assume[] the inferiority of the Tribal forum"[54] and "cannot know or accurately predict"[55] which placement the tribe might choose.[56] Weaving these threads together, the State argues that in an exceptional case when the tribe has *already decided* to change placement and that placement poses a risk of imminent physical harm or damage, there would be good cause to deny transfer. We need not decide this argument because the foster parents' evidence does not meet this extreme standard.

In light of the clear directives of ICWA and the BIA regulations, the superior court did not abuse its discretion by denying the foster parents' motion for permissive intervention to challenge transfer of jurisdiction to the Tribe.

Foster parents play a crucial role in the lives of foster children. In this case, Rosalind and Max's efforts to care for a medically fragile child are commendable. And their desire to protect him from the possibility of harm is entirely understandable.

Yet we must heed Congress's warning that states and their courts "have often failed to recognize the essential tribal relations" of Alaska Native people.[57] ICWA

---

[51]     *Piper Aircraft Co.*, 454 U.S. at 254.

[52]     25 U.S.C. § 1922.

[53]     25 C.F.R. § 23.118(c)(3) (2023).

[54]     Indian Child Welfare Proceedings, 81 Fed. Reg. 38,778, 38,824 (June 14, 2016).

[55]     2016 BIA GUIDELINES, *supra* note 32, at 50.

[56]     *See id.* at 49-51.

[57]     25 U.S.C. § 1901(5).

was drafted to confer "presumptively tribal jurisdiction"[58] so that tribes may protect Indian children consistent with tribal customs, knowledge, and values. We trust that the Togiak Tribe will carefully consider Evan's medical fragility in determining how to best care for him.

**B.     Rosalind Is Not An Indian Custodian.**

The foster parents argue for the first time on appeal that as a temporary foster parent Rosalind had legal custody under state law and therefore was an "Indian custodian" with a right to intervene under ICWA.

"Arguments not raised in the trial court are waived and will not be considered on appeal, except to the extent that plain error has been committed."[59] "Plain error exists 'where an obvious mistake has been made which creates a high likelihood that injustice has resulted.' "[60] We see no plain error here.

ICWA gives "the Indian custodian of the child . . . a right to intervene at any point in the proceeding."[61] "Indian custodian" is defined as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child."[62] The foster parents do not argue that Rosalind had legal custody under tribal law. Nor do they assert that either of Evan's parents granted Rosalind temporary physical care, custody, and control. Instead, they argue that OCS granted

---

[58]     *In re C.R.H.*, 29 P.3d 849, 853 n.16 (Alaska 2001) (emphasis omitted) (quoting *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989)).

[59]     *Hutka v. Sisters of Providence in Wash.*, 102 P.3d 947, 960 (Alaska 2004).

[60]     *Paula E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 422, 436 (Alaska 2012) (quoting *Duffus v. Duffus*, 72 P.3d 313, 319 (Alaska 2003)).

[61]     25 U.S.C. § 1911(c).

[62]     *Id.* § 1903(6).

Rosalind "legal custody . . . under State law"[63] by selecting her as a temporary foster placement.

When a child is committed to the temporary care of OCS, "a relationship of legal custody exists."[64] This relationship imposes on OCS the "responsibility of physical care and control of the child, the determination of where and with whom the child shall live, the right and duty to protect, nurture, train, and discipline the child, the duty of providing the child with food, shelter, education, and medical care, and the right and responsibility to make decisions of financial significance concerning the child."[65]

By contrast, Alaska law delegates to foster parents only responsibilities "that include decisions relating to the child's participation in age-appropriate or developmentally appropriate activities, including travel, sports, field trips, overnight activities, and extracurricular, enrichment, cultural, and social activities."[66] These limited responsibilities do not amount to legal custody over the child. Because Rosalind did not have legal custody of Evan, she was not his "Indian custodian" and therefore had no right to intervene in the CINA proceedings.[67]

### C.     A Stay Of Transfer Of Jurisdiction Pending Appeal In These Circumstances Should Be Limited To The Time Period Necessary To Permit Foster Parents To Seek Appellate Relief.

Although no party has sought review of the superior court's decision to stay transfer pending this appeal, we address it because of the importance of this issue to future cases. The superior court stayed its order transferring jurisdiction to Evan's

---

[63]     *Id.*

[64]     AS 47.10.084(a).

[65]     *Id.*

[66]     AS 47.10.084(d).

[67]     *See Taryn M. v. State, Dep't of Fam. & Comm. Servs., Off. of Child.'s Servs.*, 529 P.3d 523, 530 n.17 (Alaska 2023) (rejecting argument that distant cousin with whom OCS placed child was Indian custodian).

tribe for the duration of this appeal. The court did so to protect the foster parents' right to seek relief from this court. Because of this stay, transfer of jurisdiction to the Tribe was postponed for roughly nine months while this appeal was decided.[68]

The superior court's caution was understandable. We have recognized that once jurisdiction is transferred to the Indian child's tribe, any appeal of the transfer order becomes moot.[69] We therefore cautioned courts to "fashion any order transferring jurisdiction to tribal court in a way that does not take immediate or near-immediate effect, so as not to prejudice the ability of parties who may have objected to the transfer to seek a stay and appellate relief from this court."[70] This logic applies when the superior court denies a motion by foster parents seeking intervention for the purpose of opposing transfer to tribal courts. In this case the superior court appropriately stayed its transfer order to permit the foster parents to seek appellate relief.

Yet we must be mindful of the balance of interests in these circumstances. A request for stay pending appeal is governed by a similar standard as applies to a motion for preliminary injunction.[71] If the movant is faced with irreparable harm and the opposing party can be adequately protected, the movant is entitled to a stay if it shows "serious and substantial questions going to the merits."[72] If the opposing party cannot be adequately protected, the movant must show a probability of success on the merits.[73] The circumstances under which foster parents should be permitted to

---

[68] Although CINA appeals are expedited, resolution of this appeal was delayed several months due to the foster parents' late filing of the appeal, their delay in preparing the transcripts, and extensions they sought for briefing.

[69] *J.P. and S.P. (Foster Parents) v. State, Dep't of Health and Soc. Servs., Off. of Child.'s Servs.,* No. S-18107 (Alaska Supreme Court Order July 9, 2021).

[70] *Id.* at 5 n.6.

[71] *Powell v. City of Anchorage*, 536 P.2d 1228, 1229 (Alaska 1973).

[72] *Alsworth v. Seybert*, 323 P.3d 47, 54 (Alaska 2014) (discussing balance of hardships standard used in context of preliminary injunctions).

[73] *Id.* at 54-55.

intervene to oppose transfer of jurisdiction to the Indian child's tribe are exceedingly rare. Therefore foster parents will often fail to satisfy the requirements for a stay pending appeal. Even if the superior court finds a stay unjustified, however, it may be reluctant to foreclose the possibility of appellate review entirely by denying one.

For that reason, if foster parents move to stay the superior court's decision transferring jurisdiction pending appeal of an order denying their intervention, we instruct the superior court to issue a temporary stay for the purpose of preserving their right to appeal. The duration of the stay should be long enough to permit the foster parents to file an appeal and seek a stay pending appeal from our court. This approach will adequately balance the competing interests in these difficult circumstances.

## V.    CONCLUSION

For the foregoing reasons, we AFFIRM the order denying intervention.

CARNEY, Justice, concurring.

I agree with the court that the superior court properly denied the foster parents' attempt to prevent the transfer of this case to tribal court. But I write separately to again decry the Pandora's box opened by our *Zander B.* decision. In that case I joined Justice Winfree in dissent, predicting that the decision to allow foster parent intervention in "rare" cases was untenable and antithetical to the premise of our child protection laws.[1]

Today's case is even more troubling because it involves an Indian child and is therefore subject to ICWA. As the court observes, Congress passed ICWA specifically to address the tragic history of the intentional destruction of Native families.[2] In doing so, Congress affirmed tribes' sovereign right to determine the welfare of their children.

The foster parents here were hired by OCS to care for Evan. They have demonstrated exemplary care and commitment to Evan, and their attempt to intervene was motivated by their concern for him.

But neither federal nor Alaska law equates that concern with an interest that gives them standing. ICWA makes clear that a tribe is entitled to assert jurisdiction, and in all but the most unusual situations, state courts are to accept that assertion and transfer the case. To prevent the transfer of Evan's case to his Tribe, the foster parents were required to show that the Tribe lacks jurisdiction. But the evidence they presented and the cases they cited[3] demonstrate that their argument is really that they are better

---

[1] *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Zander B.*, 474 P.3d 1153, 1174-79 (Alaska 2020) (Winfree, J., dissenting).

[2] *See* Opinion at 9.

[3] As the court observes, every case cited by the foster parents was decided before the binding 2016 BIA regulations were promulgated specifically to prevent such decisions. *See* Opinion at 13. Yet despite their lawyer's obligation to be candid with the court, this significant adverse change in the legal foundation was not acknowledged. *See* Alaska R. Prof. Conduct 3.3.

able to care for him.  As the court makes clear, that argument is foreclosed not only by *Zander B.*, but by the updated federal regulations and accompanying Guidelines.

Although the foster parents' motivation is well-intentioned, its foundation is disrespect for the Tribe.  To grant their motion, we, and the superior court before us, would have to conclude that Alaska courts and agents are better able to determine what should happen to a Tribal child than the Tribe is.  It was that belief that drove the previous national policy of "often unwarranted" removal of tribal children and placing them "in non-Indian foster and adoptive homes and institutions"[4] at the direction of state and federal courts.

I join the court today to affirm the superior court's rejection of this attempt.  But I continue to believe that *Zander B.* was wrongly decided and fear that its "rare" exception will remain an avenue for repeated attacks upon the foundation of our child protection system and upon tribes' rights to determine their children's welfare.

---

[4]    25 U.S.C. § 1901(4).