*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TARYN M., | ) | |
| | ) | Supreme Court No. S-18509 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-19-00236 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FAMILY & COMMUNITY | ) | No. 7655 – May 16, 2023 |
| SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances: Taryn M., pro se, Anchorage, Appellant. Jessica M. Alloway, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Maassen, Chief Justice, Carney, Borghesan, and Henderson, Justices.

CARNEY, Justice.

# I.   INTRODUCTION

An adult relative of an Indian child[1] in the custody of the Office of Children's Services (OCS) appeals the denial of her request to have the child placed with her.  Because OCS demonstrated by clear and convincing evidence that the relative was an unsuitable caretaker, we affirm the superior court.

# II.   FACTS AND PROCEEDINGS

## A.   Facts

Marcy P.[2] was born in 2019; OCS assumed custody shortly after she was born.  Within the year OCS placed Marcy first with a foster family and then with Taryn M., a distant cousin.  OCS determined that Taryn is a preferred placement under the Indian Child Welfare Act (ICWA).[3]

Marcy has a severe congenital disease and required a bone marrow transplant in June 2021.  The operation took place in Seattle, and Marcy remained at the hospital until January 2022.  Taryn travelled to Seattle and remained there until October, when her family and medical leave expired and her employer refused to allow her to take additional time off.[4]

---

[1]   *See* 25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").  Marcy and Taryn are both members of Alaska Native tribes.

[2]   We use pseudonyms to protect the family's privacy.

[3]   25 U.S.C. § 1915(a)-(b) (describing "member[s] of the [Indian] child's extended family" as preferred placements for adoption and foster care).

[4]   Marcy's Seattle doctor wrote to Taryn's employer on her behalf, asking that she be given extended leave to serve as a caregiver for Marcy during the remainder of her stay.

OCS initially planned to place Marcy with Taryn after she was medically cleared to return to Alaska. Due to Marcy's increased risk of infection after the operation, however, she was unable to attend daycare. Because neither OCS nor Taryn could find a qualified individual to care for Marcy while Taryn was at work, OCS placed Marcy in a foster home with medically trained parents upon her return to Alaska instead of placing her with Taryn. But OCS continued to arrange visits with Taryn, including arranging hand-offs halfway between the foster home and her home. And OCS continued to consider Taryn a permanent placement for Marcy.[5]

However, after overnight visits that "went badly" and in light of OCS's continuing concerns about Taryn, OCS changed course. It decided not to place Marcy with Taryn permanently and, in May 2022, decided that her permanent placement would be with the foster home where she had initially been placed when she entered OCS custody. In response Taryn filed petitions for guardianship or conservatorship of Marcy, which the superior court denied as incorrectly filed. The court instead scheduled another placement review hearing to address Taryn's concerns.[6]

---

[5] Taryn requested — and the court held — two placement review hearings while Marcy was in foster care. The court accepted representations from OCS and the guardian ad litem that Taryn was Marcy's planned permanent placement, waived the requirement for a permanency report, and found that ultimately Taryn would be Marcy's permanent placement.

[6] The court did not decide whether Taryn qualified as an "adult family member," as she asserted, even though it was undisputed that she was Marcy's distant relative. The court instead found that as a "family friend" she had the same right to request a review hearing. *See* 25 U.S.C. § 1903(2) (defining "extended family member"); AS 47.14.100(m) (describing family member or friend's "right to request a hearing to review the decision" to deny placement with them); CINA Rule 19.1(e) (outlining specifics regarding family member or friend's request for hearing).

## B. Placement Review Hearing

The hearing opened with some confusion regarding the burden of proof. The superior court initially cited AS 47.10.080(s), which requires a party opposing the transfer of a child to a new placement to prove by clear and convincing evidence that the transfer is contrary to the child's best interests.[7] OCS interjected, asserting that 25 U.S.C. § 1915 — ICWA's preferred placement provision — controlled and placed the burden on OCS to prove by clear and convincing evidence that it had good cause not to place Marcy with Taryn.[8] The court agreed and said it "should have cited both" statutes.

OCS called the caseworker assigned to Marcy's case. The caseworker summarized Marcy's history in her current foster home. She testified that Marcy referred to her current foster mother as "Mom" and "embraced her for quite a long time" when they were recently reunited. She then described Marcy's "special medical needs": she testified that the operation in Seattle had compromised Marcy's immune system and that "for at least the next six months," Marcy could not be in daycare; she also testified that Marcy follows a "strict medication regimen" to address a variety of medical needs, including doctor's orders that even a normal fever required that Marcy be "brought to the hospital immediately" and no "other actions" should be taken; and

---

[7] *See* AS 47.10.080(s) ("A party opposed to the proposed transfer may request a hearing and must prove by clear and convincing evidence that the transfer would be contrary to the best interests of the child for the court to deny the transfer.").

[8] *See* 25 U.S.C. § 1915(a) ("In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with . . . a member of the child's extended family"). Good cause must be shown by clear and convincing evidence. *See Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.* (*Tununak I*), 303 P.3d 431, 446-49 (Alaska 2013), *vacated in part*, 334 P.3d 165, 167-68 (Alaska 2014) (holding that ICWA preference no longer applied to appellant in light of United States Supreme Court decision but not otherwise "disturb[ing] our decision in *Tununak I*").

she stated that Marcy was currently "doing very well" and that her care required significant coordination and collaboration with a range of providers.

The caseworker then testified about OCS's history with Taryn. Taryn had travelled to Seattle in July 2021 with Marcy and remained there during and after the transplant. According to the caseworker, Taryn had been told about Marcy's "long term medical care and certain restrictions, and the severity of not only her illness but what she would be going through." The caseworker testified that Taryn had indicated she understood those requirements.

Taryn left Seattle in October after her family and medical leave expired and her employer refused to allow her to take additional leave. The caseworker testified that Taryn gave the hospital — but not OCS — notice of her departure, and as a result, OCS had only three days to find another adult to care for Marcy. Because Marcy was no longer in the hospital, OCS had to find a series of foster parents to care for her. OCS, the hospital, and Marcy's caregivers had agreed to provide Taryn with updates, but there were difficulties with the timing and frequency of the updates. The caseworker testified that Taryn was not "respectful or communicating with them in a healthy manner that was conducive to a positive working relationship."

The caseworker testified that OCS worked with Taryn to ensure that she could continue to visit Marcy in Seattle. But she described an incident in which Taryn was told not to visit on a specific weekend because one of Marcy's caregivers would be receiving training about how to care for Marcy. Taryn nevertheless travelled to Seattle, causing "a disruption" to the training because the hospital's COVID policies restricted the number of people that could be with Marcy.

The caseworker testified that when Marcy was able to return to Alaska, OCS worked with Taryn to accompany Marcy back. Taryn, however, did not fly to Seattle. Shortly before she was scheduled to leave Alaska, Taryn advised OCS that she did not think it was appropriate to put Marcy on a commercial flight. The caseworker

testified that Taryn also stated she was concerned Marcy did not have appropriate winter clothes. According to the caseworker, OCS had already addressed these concerns and made Taryn aware of this. The caseworker testified that because Taryn did not fly to Seattle, OCS had to find another escort for Marcy at the last minute.

The caseworker testified that OCS continued to try to place Marcy with Taryn despite these conflicts. But because Marcy could not be in group settings and Taryn had to work during the day, another caregiver was needed for Marcy while Taryn worked. The caseworker testified that OCS was unable to locate someone to care for Marcy during the day and Taryn's "go-to" support, her sister, was unavailable because of recent surgery. She stated that OCS therefore placed Marcy in a foster home instead of with Taryn.

During this time OCS sought to facilitate visitation between Marcy and Taryn, even though the foster parents and Taryn lived in different communities. After visits Taryn reported concerns about Marcy's clothing, her exposure to the foster home's dog, the appropriateness of supplies for her care, and injuries that Marcy suffered. The caseworker testified that OCS did not share her concerns and that Taryn did not substantiate them.

The caseworker then described a series of "concerning" incidents connected to an overnight visit in April 2022. She testified that after the visit, Taryn did not return Marcy to the foster home and "stated that she would not be returning her." The caseworker stated that Taryn did not give OCS an opportunity to adjust the plan for her return to the foster home or provide additional daily medications that Marcy needed. The caseworker acknowledged that Taryn did bring Marcy to a medical appointment scheduled the next day, but the medical staff expressed concerns about Marcy's condition and Taryn's impatience and roughness with her. And the caseworker testified that after Taryn returned Marcy to the foster parent, the foster parent reported

that Taryn had taken Marcy to church and treated "a slight fever" with Tylenol, both of which were against medical directions.[9]

The caseworker testified that she attempted to talk to Taryn about these concerns, but Taryn "was not receptive," "not willing to engage in ongoing communications," and "dismissive of the concerns." The caseworker then offered Taryn a psychological assessment, which upset Taryn. There is scant evidence explaining why the caseworker suddenly suggested an assessment. According to the caseworker, the April visit was the last contact between Taryn and Marcy due to "communication issues" between Taryn and Marcy's foster parents.

Finally, the caseworker testified that she was not aware of any changes in OCS's concerns about placing Marcy with Taryn and noted OCS's concern about Taryn's "ability to meet [Marcy's] needs once OCS [i]s no longer involved." She stated that "[i]t is not uncommon for a child that has had a bone marrow transplant to need additional services" that are not available in Alaska. She suggested that Taryn's previous inability to extend her leave or secure "necessary supports" like alternative caregivers showed she would not be able to support Marcy if she needed more treatment.

Taryn testified on her own behalf. She began by emphasizing her love for Marcy; her qualifications — including a degree in healthcare administration and employment at a hospital — and positive qualities; her support of Marcy while she was in Seattle for the transplant; and the importance of keeping Marcy connected to her Iñupiaq heritage. She disagreed with the caseworker, testifying that there was only one other child at the church event to which she took Marcy and that Marcy had a bruise that she suffered while with her current foster family. Taryn stated that she would be

---

[9]     Taryn disagreed with the caseworker's account during the caseworker's testimony, during her own testimony, in her briefing on appeal, and at oral argument before us.

able to care for Marcy, noting that her sister was "getting stronger" and that she had "a person in mind" for daycare. She testified that she had never "tr[ied] to hurt [Marcy] or harm her." After she expressed interest in calling her sister to testify, the court offered to continue the hearing another day, but Taryn ultimately declined.

Both parties made closing arguments after Taryn testified. OCS first stated that it "appreciate[s] [Taryn] and the things that she has done," adding that "[n]o one is disputing her feelings for [Marcy] and it's fantastic that she is such a support for her." But in OCS's opinion, Taryn demonstrated "extremely concerning" behavior and as a result OCS feared she would not follow Marcy's treatment plan or meet her medical needs. OCS also expressed "concern about whether or not [Taryn] is willing to participate and cooperate with" it and suggested, with little support, that Taryn had mental health issues that she was "not interested in addressing . . . at all."

In her closing Taryn stated that she was unable to accompany Marcy back from Seattle because of an issue with her ticket that was out of her control. She disagreed that there were any problems with her communication with Marcy's doctors and other professionals, stating that she did not receive the promised updates and that she had to send messages after work hours because "[t]his wasn't a 9:00 to 5:00 situation [Marcy] was under." She asserted that she gave OCS "at least 10 days" notice before she left Seattle at the end of her leave time. Taryn emphasized that OCS had not provided respite daycare for Marcy while Taryn worked and reemphasized that she had taken care of Marcy during her recovery. Taryn pointed out that she helped one foster parent persuade Marcy to take her medication.

The guardian ad litem (GAL) "agree[d] with OCS's decision," pointing to "concerns raised by . . . health care providers" about Taryn. He called OCS's choice "reasonable" and "probably the only prudent or responsible choice." But he advocated for continued contact with Taryn, who he said was "a part of Marcy's life," "has

sacrificed for her," and is "connected" to her. In response OCS added that it was "not opposed to visitation."

The court ruled in favor of OCS. The court first agreed that OCS "should work with [Taryn] for visitation," because "[s]he's family" and "obviously has great affection and love for the child." But the court also agreed with OCS's decision. It listed its own concerns — Taryn's taking Marcy to church, her treatment of the fever, her sudden departure from Seattle, and her inability to provide Marcy with appropriate daycare. And the court recognized that "OCS has got a fair bit of discretion." It concluded that OCS's placement was not "unreasonable" because Taryn "did not seem to act appropriately" or "hav[e] an understanding about the child's full needs." It declined to "overrule . . . OCS's decision on placement," finding that Taryn did not "establish[] any clear and convincing evidence to overturn what OCS did or even vice-versa." The court ended by acknowledging the materials Taryn had filed with the court about the importance of Marcy's culture and again encouraged OCS to work with her to arrange visits.

## C.    Subsequent Proceedings

At a status hearing for Marcy the next month, OCS described "really good news" regarding Marcy's improving health. It also advised the court that there was an adoption home study in progress for the foster family. The court advised the parties that Taryn had filed documents with the court accusing OCS of "stonewalling her" about arranging visits. OCS responded that it not heard anything from Taryn about visitation. Taryn interjected and disagreed. She also stated that OCS had tried to place other Native children with her, describing it as an attempt "to trade [Marcy]." She reiterated that she was a preferred placement for Marcy and attempted to give the court traditional clothing for Marcy. The court advised her that it was "not the time nor the place . . . to advocate reconsideration" of Marcy's placement. It also advised Taryn that even though the deadline for her to file an appeal of the placement decision had passed,

under the circumstances "[m]aybe the Supreme Court would still accept [her] appeal." Taryn subsequently filed an appeal, which we accepted.

## III.  STANDARD OF REVIEW

We review factual findings for clear error.[10]  Whether those factual findings "comply with ICWA requirements is a question of law" to which we apply our independent judgment.[11]  Whether the correct legal standard was applied is also a question of law to which we apply our independent judgment.[12]

## IV.  DISCUSSION

Taryn represents herself; we therefore hold her pleadings "to less stringent standards than those of lawyers."[13]  "But this relaxed standard has limits; for example, 'even when a [self-represented] litigant is involved, an argument is considered waived when the party cites no authority and fails to provide a legal theory for his or her argument.' "[14]

Taryn first argues that she is a preferred placement according to ICWA and emphasizes ICWA's important policy goals.  Because no one has disputed that Taryn is a preferred placement, OCS was required to demonstrate good cause for its decision not to place Marcy with her.[15]  But OCS and the GAL correctly observe that

---

**10**  *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 550 (Alaska 2017).

**11**  *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Michelle P.*, 411 P.3d 576, 582 (Alaska 2018).

**12**  *Timothy W. v. Julia M.*, 403 P.3d 1095, 1100 (Alaska 2017).

**13**  *Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987).

**14**  *Thoeni v. Consumer Elec. Servs.*, 151 P.3d 1249, 1257 (Alaska 2007) (quoting *Peterson v. Ek*, 93 P.3d 458, 464 n.9 (Alaska 2004)).

**15**  25 U.S.C. § 1915; *Paula E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 422, 438 (Alaska 2012).

the good cause inquiry only arises if a "suitable caretaker" exists.[16]  They argue that

Taryn is not suitable.  We are therefore presented with two threshold questions:  (1)

whether the superior court applied the correct standard when making its suitability

determination; and (2) whether Taryn was a suitable caretaker under ICWA.[17]

> **A.     The Superior Court Applied The Incorrect Standard, But The Error Was Harmless.**

Both OCS and the GAL recognize that the superior court "could have been

clearer" and "was regrettably inarticulate" when discussing the burden of proof for the

placement review hearing.  But OCS argues that the court expressly found that OCS

---

[16]     *See Tununak I*, 303 P.3d 431, at 450 (Alaska 2013).

[17]     Taryn makes several other arguments.  We do not agree that she should be considered an "Indian custodian."  No evidence was presented to the superior court that she had legal custody of Marcy as provided by ICWA.  *See* 25 U.S.C. § 1903(6). Because Taryn was neither Marcy's parent nor Indian custodian, OCS was not required to make "active efforts" to keep Marcy with her, as she argues.  *See* 25 U.S.C. § 1912(d).

Taryn also argues that Marcy's First Amendment right to learn about Iñupiaq culture has been violated.  But although both state and federal law encourage maintaining a child's connection with her culture, Taryn does not have standing to argue for Marcy's constitutional rights.  *See Keller v. French*, 205 P.3d 299, 304 (Alaska 2001) (noting that third parties generally do not have standing to assert another's constitutional rights).  *But see Bonjour v. Bonjour*, 592 P.2d 1233, 1241 n.15 (Alaska 1979) (noting exception for parents asserting constitutional rights of children).

Finally, we do not reach Taryn's argument that she is "an adult family member" under AS 47.14.100(m).  The superior court addressed that issue at the start of the placement review hearing because it needed to determine whether she was a preferred placement and whether she was entitled to request a review hearing.  The court declined to decide the issue, noting first that "it is the Tribe's customs that ideally govern this determination" and that considering her "a family friend" under the statute entitled her to request the review.  We recognize that the legal term "family friend" does not reflect Taryn and Marcy's relationship as family members; but that designation provided Taryn the same rights as "an adult family member."  The issue is therefore moot.

met its burden and that, even though the court incorrectly stated that Taryn had failed to carry her burden "to overturn what OCS did," it did not abuse its discretion. The GAL argues that any error was harmless, pointing to OCS's conduct in correcting the court and evidence in the record suggesting that OCS met its burden. We agree with the GAL.

ICWA's preferred placement provision — 25 U.S.C. § 1915 — places the burden of proving good cause to deviate from a preferred placement on OCS, which must establish good cause by clear and convincing evidence.[18] We have not previously determined whether the same burden and standards apply to "the issue of the suitability of preferred placements,"[19] and have acknowledged that they may be, but do not have to be, the same.[20] In an unpublished decision, *Kelly C.*, we affirmed a superior court's decision to place the burden on OCS to show unsuitability by clear and convincing evidence.[21] We now adopt this approach: when the suitability of a preferred placement under ICWA is in question, OCS must prove the placement's unsuitability by clear and convincing evidence.

---

[18]     25 U.S.C. § 1915; *Paula E.*, 276 P.3d at 438.

[19]     *In re Adoption of Sara J.*, 123 P.3d 1017, 1023 (Alaska 2005).

[20]     *Compare Tununak I*, 303 P.3d at 450 n.94 (declining to decide standard of proof but "discern[ing] no principled basis for adopting inconsistent standards") *with Sara J.*, 123 P.3d at 1023 ("It is not plain from the language of the statute that standards applicable to the issue of the suitability of preferred placements must necessarily also apply to the issue of good cause. Rather, accepted principles of statutory interpretation suggest that the opposite is true.").

[21]     *See Kelly C. v. State, Dep't of Health & Soc. Servs.*, *Off. of Child.'s Servs.*, No. S-15923, 2016 WL 281055, at *4, *7 & n.31 (Alaska Jan. 20, 2016) (noting that application of "clear and convincing" standard is "[c]onsistent with our decision in *Tununak I*").

OCS expressly, consistently, and voluntarily assumed this burden at the placement review hearing. OCS specifically referred the superior court's attention to 25 U.S.C. § 1915 and in its closing argument again asked the court to find that it had met its burden under that statute. But despite agreeing with OCS that 25 U.S.C. § 1915 applied, the court continued to place the burden on Taryn. The superior court told Taryn explicitly that she was required to "show [the court] that . . . [OCS has] made a mistake here." And it declined to "overrule . . . OCS's decision" because Taryn had not "established any clear and convincing evidence to overturn what OCS did."[22] At a subsequent status hearing, the court reiterated that it had declined to overturn a discretionary OCS decision "that [it] thought had a reasonable basis." It was legal error to place the burden on Taryn to "overturn" OCS's placement decision.

Although it was error to assign a burden to Taryn, "[w]e must disregard harmless errors that have no substantial effect on the rights of parties or on the outcome of the case."[23] We therefore review the record to determine whether OCS presented clear and convincing evidence to the superior court demonstrating that Taryn was not a suitable caretaker.

---

[22] The superior court added "or even vice-versa," which OCS argues is a sign that the court also imposed a burden on OCS. But this strained reading of an already incorrect statement is not sufficient to overcome the legal error raised by the court's other statements.

[23] *Amy S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 440 P.3d 273, 279 (Alaska 2019) (alteration in original) (quoting *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016)); *see also* Alaska R. Civ. P. 61 ("The court . . . must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); CINA Rule 1(e) (applying Civil Rule 61 to CINA proceedings).

**B.** **There Was Clear And Convincing Evidence That Taryn Was Not A Suitable Caretaker.**

OCS and the GAL argue that Taryn is unsuitable because she is either unable or unwilling to care for Marcy's special medical needs. These are in fact two separate arguments, and we are not persuaded that Taryn is unable to care for Marcy.[24] But because the record before the superior court indicated that Taryn was unwilling to abide by Marcy's treatment plans, we agree with the superior court's conclusion that Taryn was not a suitable caretaker.[25]

"[B]efore determining whether good cause exists to deviate from the placement preferences, a court must first inquire as to whether any suitable preferred placements exist . . . . In other words, the court must determine not only that a

---

[24] Although there was testimony that Marcy did have a follow-up visit to Seattle, there is nothing in the record indicating how long the visit lasted or whether Taryn could have gone. Taryn testified that she would be able to take the necessary leave, that her sister's health was improving to where she could presumably serve as support, and that she had someone "in mind" for daycare. OCS's unsupported assertions about Taryn's availability and mental health do not establish by clear and convincing evidence that she is unable to care for Marcy.

[25] *Cf. Shirley M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 342 P.3d 1233, 1245 (Alaska 2015) (finding good cause where relative "did not recognize the extent of [the child's] special needs" and seemed unlikely to meet child's high needs); *Burke P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 162 P.3d 1239, 1245 (Alaska 2007) (upholding termination of parental rights where parent "was either unwilling or unable to realize that his behavior adversely impacted his children" and took no responsibility for negative impacts); *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 88 P.3d 527, 531 (Alaska 2004) (finding that relative's "unwillingness to cooperate with [OCS]" supported finding of likely future harm and noting that "denying child placement with a relative requires the same 'clear and convincing evidence' as the termination of parental rights"); *Kelly C.*, 2016 WL 281055, at *7 (finding that relatives were unsuitable in part because of failure to address child's "extensive medical needs").

placement is preferred, but also that the placement would be a suitable caretaker for the child."[26] These inquiries "often overlap and can rarely be considered independent of one another," but they are still "separate."[27] While we have not "detail[ed] the factors a court may consider in its suitability analysis," we have suggested that "a potential placement's age, . . . inability to suggest a person who could care for the child if [the potential placement] became incapacitated, . . . criminal history, . . . health, and . . . lack of a support system" are relevant.[28] Suitability is considered "in light of the prevailing social and cultural standards of the Indian community."[29]

Our previous cases do not make clear whether suitability is a factual finding, a discretionary determination, or a legal question. In *Kelly C.* we treated clear and convincing evidence of suitability as a factual finding reviewed for clear error.[30] But the logic of *Tununak I* suggests that clear and convincing evidence of suitability could, like good cause, be a discretionary determination reviewed for abuse of discretion.[31] And when reviewing comparable determinations requiring clear and

---

[26]    *Tununak I*, 303 P.3d 431, 450 (Alaska 2013).

[27]    *Id.* at 450-51.

[28]    *Id.* at 451.

[29]    *Id.* at 453.

[30]    *See Kelly C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-15923, 2016 WL 281055, at *6 (Alaska Jan. 20, 2016).

[31]    *Tununak I*, 303 P.3d at 440, 447.

Our standard of review for whether good cause exists under state law, rather than ICWA, is "unsettled." *Celia W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-17954, 2021 WL 4191436, at *3 (Alaska Sept. 15, 2021). In unpublished decisions we have declined to decide the issue but acknowledged that the determination may be reviewed for abuse of discretion or treated as a mixed question of fact and law. *See id.*; *Rose D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-17569, 2020 WL 3830597, at *6 & n.17 (Alaska July 8, 2020).

convincing evidence we have suggested that clear and convincing evidence in those matters is a legal question to which we apply our independent judgment.[32]

We need not decide the precise nature of the suitability finding or, in turn, which standard of review applies here. Given the evidence presented and the judge's factual findings, which are not clearly erroneous, the only tenable outcome was to determine that Taryn was unsuitable. On this record it would be clear error or abuse of discretion to rule that a person who is unwilling to abide by medical providers' recommendations for such a medically fragile child is suitable. Because the factual findings can support only one conclusion, we affirm the superior court's decision.

OCS presented evidence of several examples of Taryn's seeming unwillingness to recognize or meet Marcy's special medical needs. The caseworker's uncontradicted testimony was that Taryn understood that even a minor fever required Marcy to go to the emergency room for treatment and that no other treatment was

---

[32] We have held, for example, that in the context of involuntary medical treatment for mental illness, the clear and convincing evidence burden applies to the ultimate legal determination rather than to findings of historical fact, which are reviewed for clear error in the normal fashion. *See In re Hospitalization of Lucy G.*, 448 P.3d 868, 876-78 (Alaska 2019).

We have also held that third parties seeking visitation against parental wishes must prove by clear and convincing evidence that it is detrimental to the child to limit visitation to what the parents will allow. *See Christy v. Conrad*, 524 P.3d 231, 235, 237-38 (Alaska 2022). In such cases the underlying findings of fact are reviewed for clear error but the question whether there was clear and convincing evidence of detriment is seemingly a legal one. *See id.*

Finally, we have treated compliance with other ICWA requirements — like the requirement that OCS engage in "active efforts" and the requirement that courts find a child is likely to be seriously harmed if returned to their parents — as mixed questions of fact and law. *See E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002). In those cases we review factual findings for clear error and apply our independent judgment to legal conclusions. *See id.*

allowed.  But Taryn gave Marcy Tylenol to treat a fever and did not take her to the hospital as she had been instructed to do.  And according to OCS Taryn also refused to return Marcy after a visit, without giving notice to OCS and without having additional medication for Marcy.

In her briefing and at oral argument before us, Taryn disputes OCS's accounts of these incidents and offers further explanations for her actions.[33]  She says she "never, ever . . . refuse[d]" to return Marcy and would not "jeopardize [their lives] in such a hideous manner."  She explains instead that Marcy's foster mother offered to let Taryn take Marcy to her medical appointment in the morning, implying that Taryn could keep Marcy an additional night.[34]  And she argues that OCS was responsible for the missed hand-off because it did not give her notice of the time.[35]  She also stated at argument before us that she never gave Tylenol to Marcy and that her return visit to Seattle was only to retrieve her belongings.

But our review is limited to the evidence and arguments presented to the superior court at the time of the placement review hearing.[36]  And at the time of the

---

[33]    Taryn also objects to OCS's decision not to provide respite care or enroll Marcy in daycare.  But while OCS may authorize or pay for respite care, it is not required to do so.  *See* AS 47.14.100(d)(2).  And as OCS explained at the placement review hearing, the decision not to enroll Marcy in daycare was the result of her special medical needs.

[34]    Taryn notes that "there was enough medication" for this brief extension of the visitation.

[35]    Taryn notes that the hand-off times were often "one hour or 2 hours off" from when they were scheduled and argues that "[i]t was bizarre that Marcy was even placed in another city."

[36]    *See Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 856 (Alaska 2013) ("On appeal, we review a trial court's decision in light of the evidence presented to that court.").

superior court's decision, the evidence suggested that Taryn was unwilling to abide by the requirements necessary to care for Marcy's special medical needs. Her unwillingness to do so was clear and convincing evidence that she was an unsuitable caretaker.[37]

## V. CONCLUSION

We AFFIRM the superior court's decision.

---

Taryn also raises concerns about the current foster parents and their attempts to adopt Marcy. But these arguments are beyond the scope of this appeal. *Cf. Clementine F. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 375 P.3d 39, 47 (Alaska 2016) (emphasizing that scope of court's decision was limited to deciding between parental custody and State custody, not placement of child with particular parent).

[37] Like its discussion of burdens of proof, the superior court's determination that Taryn was unsuitable was not clearly articulated. It did not specifically make a "separate" or "distinct" analysis of Taryn's suitability when it considered whether OCS had good cause to deviate. *See Tununak I*, 303 P.3d 431, 452 (Alaska 2013). But the court's statements that Taryn had raised "red flags," "did not seem to act appropriately," and did "not ha[ve] an understanding about the child's full needs" reflect the court's analysis of her suitability as a caretaker. *Cf. Kelly C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-15923, 2016 WL 281055, at *6-7 (Alaska Jan. 20, 2016) (treating finding that relatives were "unsafe" as finding that they were "unsuitable or unavailable").