*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| PETRA J., ) | |
| ) | Supreme Court No. S-19563 |
| Appellant, ) | |
| ) | Superior Court No. 1KE-19-00019 CN |
| v. ) | |
| ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT ) | |
| OF FAMILY & COMMUNITY ) | No. 7808 – April 22, 2026 |
| SERVICES, OFFICE OF ) | |
| CHILDREN'S SERVICES, ) | |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, Daniel Doty, Judge.

Appearances: Amanda J. Harber, 49th State Law, LLC, Soldotna, for Appellant. Jennifer Teitell, Assistant Attorney General, Anchorage, and Stephen J. Cox, Attorney General, Juneau, for Appellee. Rachel Espejo, Central Council of Tlingit & Haida Indian Tribes of Alaska, Juneau, for Intervening Tribe. Margaret McWilliams, Assistant Public Advocate, and James E. Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Borghesan, Henderson, Pate, and Oravec, Justices. [Carney, Chief Justice, not participating.]

BORGHESAN, Justice.

## I.    INTRODUCTION

The Indian Child Welfare Act (ICWA) requires the Office of Children's Services (OCS) to follow a set of preferences when placing an Indian child in foster care.  The top preference is a member of the child's extended family; the next preference is a foster home approved by the child's tribe; the third preference is an Indian foster home; and the fourth preference is an institution approved by the child's tribe.  If a higher-preference foster home exists but is not "suitable," then OCS may place the child in a lower-preference placement.

In this case OCS removed a child from her parents and placed her with a relative.  But after growing concerned about the child's health, OCS moved the child to another foster home, which was a lower-preference placement.  The relative challenged the placement change.  After an evidentiary hearing, the superior court found that the relative failed to get treatment for the child's significant dental decay and failed to meet the child's dietary needs, causing her growth to flatline.  Based on these findings, the court ruled that the relative was not a suitable foster parent.  Therefore, it upheld OCS's decision to place the child in a lower-preference foster home.

We affirm the superior court's order.  We see no clear error in the superior court's factual findings.  And because a foster parent who fails to meet a child's basic dental and nutritional needs is not a suitable foster parent, the superior court did not err in upholding OCS's decision to move the child to a lower-preference foster parent who could appropriately meet her needs.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Ax̱adée[1] and her sister Jalissa were removed from their parents in 2019 when Ax̱adée was about six months old and Jalissa was nearly three years old.  Both

---

[1]     We use pseudonyms and refer to the children's tribe generically as "the Tribe" to protect the family's privacy.

are Indian children as defined by ICWA.[2] After a previous foster home did not work out, OCS sought to place the children with their mother's cousin, Petra J., who is a member of the same tribe as the children. Because Petra lived in Seattle, Washington, OCS submitted a placement request to Washington child protection authorities through the Interstate Compact on the Placement of Children, and the placement was approved.

When the children arrived in Seattle in January 2023, they were in poor physical condition. Ax̱adée, then four years old, was underweight, and both she and Jalissa had serious dental issues. Petra took both children to the dentist shortly after their arrival in Seattle, and the dentist noted that Ax̱adée had cavities and recommended silver caps and fillings, which Medicaid covers.[3] Though Petra arranged for dental surgery to fix Jalissa's dental issues and described seeking alternative treatments for Ax̱adée, the record does not show that Ax̱adée ever received follow-up care or had her cavities treated during the two years she spent in Petra's home.

Petra reported to medical providers that both Ax̱adée and Jalissa had food insecurity issues, including hyperphagia.[4] Petra restricted Ax̱adée to a dairy-free diet and imposed other limitations on her food intake. While in Petra's care, Ax̱adée's growth slowed dramatically. In March 2023, shortly after Ax̱adée arrived in Seattle,

---

[2]   *See* 25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

[3]   Nearly all children in OCS custody are eligible for Medicaid coverage. *See* 7 Alaska Administrative Code 100.270 (providing Medicaid eligibility for children "receiving, or on whose behalf a foster parent is receiving, foster care maintenance payments").

[4]   Hyperphagia is "a feeling of extreme, insatiable hunger." *See Polyphagia (Hyperphagia)*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/symptoms/24637-polyphagia-hyperphagia (archived at https://perma.cc/22ZP-L2JV). Medical records showed that Petra reported that Ax̱adée "[would] eat constantly if unsupervised, to the point of vomiting."

her weight was in the thirtieth percentile and her height was in the twenty-seventh percentile for her age. By October 2024, her weight had dropped into the fourth percentile and her height was in the second percentile. Petra took Aҳadée to specialists to address her growth issues, but they were unable to explain her poor growth.

In late spring 2024, Petra asked OCS to move Jalissa to a different foster home due to Petra's belief that Jalissa had "very complex needs" and that she was having a negative effect on Aҳadée. OCS transferred Jalissa to Chastity W., who lived in Alaska, was a licensed therapeutic foster parent, and was a member of the same tribe as the children. The children's tribe approved Jalissa's placement with her.[5]

In fall 2024 Petra had a disagreement with Aҳadée's school over her diet. The school contacted OCS about its interactions with Petra. As OCS gathered information, it grew increasingly concerned about Aҳadée's welfare and decided to place her in a different foster home. An OCS worker flew to Seattle in January 2025 to retrieve Aҳadée. OCS placed Aҳadée with her sister Jalissa in Chastity's home in Alaska. OCS also made a protective services report to Washington authorities reflecting its concerns about Petra's care of Aҳadée, which prompted Washington to investigate Petra's care.

Chastity took Aҳadée to appointments with a pediatrician, dentist, and dietician shortly after her return to Alaska. Her dentist identified "extensive" decay and a "red bubble" on her gums the "size of a pea." The dentist referred Aҳadée to a specialty dentist because of "rampant" cavities. Aҳadée underwent an hours-long surgery to have five teeth pulled, other teeth capped, cavities filled, and an abscess treated. Aҳadée's pediatrician also removed the dietary restrictions that Petra had

---

**5**    According to the children's tribe, Chastity is a second-tier placement under ICWA, that is, "a foster home licensed, approved, or specified by the Indian child's tribe." 25 U.S.C. § 1915(b)(ii).

imposed. No adverse effects from lifting these restrictions were observed, and Ax̱ adée began gaining weight.

### B. Proceedings

Petra filed a request in superior court to review OCS's placement decision. The superior court held a placement review hearing over six days in May, June, and July 2025.

Petra testified at length. She addressed Ax̱ adée's dental needs, nutrition, and growth. Petra also addressed her relationship with OCS.

Petra testified that she was aware of Ax̱ adée's dental concerns, which included visible cavities, describing them as not as "severe and pressing" as Jalissa's dental needs. Petra testified that Ax̱ adée never complained to her of tooth pain. She noted that after Ax̱ adée's first dental appointment, the dentist recommended silver caps, which Petra felt were "a severe treatment." She testified that she looked for alternative treatment options, as she was concerned about the efficacy of silver caps and stigma around them. She testified that she requested augmented foster care rates from OCS to pursue other options. But she could not recall whether Ax̱ adée ever returned to the dentist after the first appointment or whether she made any additional appointments. She also could not recall the names of any dentists she consulted, and she was "unsure" of how often she contacted other dentists. She testified that she was "not concerned" about what she observed of Ax̱ adée's dental health.

Petra also testified extensively about Ax̱ adée's difficulties with eating. She described Ax̱ adée and Jalissa as "ravenous, completely insatiable" eaters with "intense sugar-seeking behaviors." She described both Ax̱ adée and Jalissa as exhibiting food insecurity behaviors, including hyperphagia and food hoarding. She described Ax̱ adée's digestive problems, and testified that she experimented with eliminating dairy from Ax̱ adée's diet to relieve her constipation, ultimately removing dairy altogether. She also testified about the specialist medical care she sought for Ax̱ adée's poor growth. She testified that Ax̱ adée's pediatrician referred her to an

endocrinologist, gastroenterologist, and a nutritionist. She testified that she recalled being told by the endocrinologist that Ax̱adée did not have growth hormone deficiency. She also testified that Ax̱adée never had any allergy tests.

Petra expressed frustration with OCS's treatment of her. She testified that it took several months to receive the children's medical records from Alaska, that she felt that her request to be funded at augmented foster care rates was "dismissed" by OCS, and that OCS did not support her family.

Petra also presented several witnesses — a neighbor, family friends, Ax̱adée's preschool teachers, and Ax̱adée's former therapist — who testified in her favor. They testified generally that Petra was a good and conscientious parent and that Ax̱adée and Jalissa seemed happy and healthy in her care.

OCS presented testimony from caseworkers who had interacted with the family, from Chastity, and from Ax̱adée's pediatrician in Alaska.

An OCS supervisor described the events leading to OCS's decision to move Ax̱adée from Petra's home to Chastity's. She described a December 2024 meeting with Petra and Ax̱adée's school and her subsequent concern that OCS was not receiving full information about Ax̱adée's health from Petra. She testified that after the meeting she began requesting Ax̱adée's medical records, and medical providers expressed concerns about Petra's care. She also testified that the medical records did not support what Petra reported to OCS and to Ax̱adée's school about her health.

Chastity testified about how Ax̱adée was doing in her home. She testified that when Ax̱adée arrived, she was "very scared" and "very concerned about the food that she was eating," but that she was "so very happy" to see Jalissa. Since Ax̱adée's arrival, Chastity testified that she had taken Ax̱adée to four or five pediatrician appointments, an appointment with a dietician, the dentist, and an eye exam.

Regarding Ax̱adée's dental care, Chastity recalled observing "right off the bat" that there were "several black spots on [Ax̱adée's] teeth that indicated a cavity," as well as "just a small sliver of a tooth" in the front of her mouth. Chastity

also saw "a bubble on her tooth" that was red and pus-filled and caused Ax̱adée pain. She testified that Ax̱adée told her that her teeth and mouth hurt and that Ax̱adée was having difficulty brushing and flossing her teeth. She testified that Ax̱adée underwent a several-hour dental surgery under anesthesia and had four or five teeth removed. She reported that after the surgery, Ax̱adée seemed to have no more pain or difficulty with brushing and flossing her teeth.

Regarding Ax̱adée's growth, Chastity also testified that Ax̱adée had gained weight and was "able to eat any and all foods without any issues" at home and school.

Ax̱adée's pediatrician in Alaska testified about Ax̱adée's growth and weight gain after returning to Alaska. He testified that at Ax̱adée's first appointment with him in January 2025, she was "around . . . the tenth percentile for weight and less than the first percentile for height." At that time, he recommended no restrictions on her diet. He testified that at Ax̱adée's third appointment, about two months later, she had progressed to the twentieth percentile for weight and the tenth percentile for height. He stated that he was not concerned about "malabsorption, failure to thrive, or concerns for short stature or growth hormone deficiency." And he opined that Ax̱adée's growth since her return was consistent with what he would expect from a child who was previously under-nourished. He also noted that Ax̱adée had "pretty substantial dental cavities" and "pretty significant dental decay" that he observed when he first saw her in January 2025.

In written closing arguments, OCS, Ax̱adée's tribe, and the GAL argued that Petra was an unsuitable caregiver because she failed to meet Ax̱adée's dental and medical needs. Petra argued that OCS had not met its evidentiary burden to justify the placement transfer. She argued that OCS's witnesses were not credible, that she appropriately addressed Ax̱adée's dental and nutritional needs, and that remaining in Seattle with her was in Ax̱adée's best interests.

The superior court affirmed OCS's decision to move Ax̱adée from Petra's home to Chastity's. Applying both Alaska statutes governing OCS's placement decisions and ICWA's placement preferences, the superior court found three reasons that justified OCS's decision: (1) reunifying Ax̱adée with her sister Jalissa was in Ax̱adée's best interests; (2) Petra did not address Ax̱adée's dental needs; and (3) Petra failed to address "serious dietary issues" that led to Ax̱adée being underweight upon her return to Alaska. The court was not persuaded by Petra's explanation of how she handled Ax̱adée's care. Regarding Petra's assertion that she restricted Ax̱adée's diet due to lactose intolerance, the court found that "no provider has ever diagnosed [Ax̱adée] with lactose intolerance" and noted that Ax̱adée was now consuming dairy products without issue. The court described the dietary limitations Petra had imposed as "manufactured unnecessary restrictions to [Ax̱adée's] diet." The court ultimately concluded that Petra had, "either intentionally or negligently, failed to provide [Ax̱adée] with the nutrition necessary to grow." The court therefore found that "OCS has provided ample justification for its decision to remove [Ax̱adée] from [Petra's] home."

## III.   DISCUSSION

The crux of this appeal is whether OCS was justified in removing Ax̱adée from Petra's home and placing her with a foster parent who, under ICWA, had a lower statutory preference. As noted earlier, ICWA creates a set of preferences for foster care placement.[6] A court may deviate from these preferences only upon a showing of good cause.[7] But "before determining whether good cause exists to deviate from the placement preferences, a court must first inquire as to whether any suitable preferred

---

[6]   25 U.S.C. § 1915(b).

[7]   *Id.*

placements exist."[8]   "[A]lthough separate inquiries, the suitability and good cause determinations will often overlap and can rarely be considered independent of one another."[9]  A foster parent's suitability is considered "in light of the prevailing social and cultural standards of the Indian community."[10]

In this case the superior court did not use the term "suitable" in its decision.  But we view its conclusion that Petra's failure to meet Ax̱adée's dental and dietary needs justified departure from ICWA's placement preferences as, functionally, a ruling that Petra was not a suitable foster parent.[11]

"[W]hen the suitability of a preferred placement under ICWA is in question, OCS must prove the placement's unsuitability by clear and convincing evidence."[12]   Clear and convincing evidence "is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to

---

[8]      *Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. (Tununak I)*, 303 P.3d 431, 450 (Alaska 2013), *vacated in part*, *Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 334 P.3d 165 (Alaska 2014).

[9]      *Tununak I*, 303 P.3d at 450.

[10]      *Taryn M. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 529 P.3d 523, 532 (Alaska 2023).

[11]      *See id.* at 533 n.37 (deciding that the superior court had appropriately analyzed the relative's suitability even where its determination was "not clearly articulated").  The parties used the "suitability" framing in their briefs.  The parties also addressed AS 47.14.100, which sets out preference tiers for foster care placements under Alaska law and similarly requires OCS to demonstrate by clear and convincing evidence that there is good cause to depart from the preferred order.  *See* AS 47.14.100(e) (setting out placement preferences); AS 47.14.100(m) (discussing evidence of good cause to depart from placement preferences).  While Ax̱adée's move was also a placement transfer under AS 47.10.080(s), the more stringent protections of ICWA and AS 47.14.100 control this case.

[12]      *Taryn M.*, 529 P.3d at 531.

be proved."[13]  In *Taryn M. v. State, Department of Family & Community Services, Office of Children's Services*, we held that a relative foster parent's "unwilling[ness] to abide by the requirements necessary to care for [her foster child's] special medical needs . . . was clear and convincing evidence that she was an unsuitable caretaker."[14] We also observed that "[o]ur previous cases do not make clear whether suitability is a factual finding, a discretionary determination, or a legal question."[15]  Here, as in *Taryn M.*, "[w]e need not decide the precise nature of the suitability finding or, in turn, which standard of review applies" because "the factual findings can support only one conclusion":  that Petra is an unsuitable foster parent.[16]

Petra primarily disputes the court's factual findings about Ax̱adée's dental health and nutrition.  She argues that OCS and the Tribe did not prove by clear and convincing evidence that she failed to address Ax̱adée's dental and nutritional needs.  She also argues that the *Taryn M.* decision should not control her case because the child in *Taryn M.* was much more medically fragile than Ax̱adée.  We are not persuaded by these arguments.  The trial court's factual findings about Petra's failure to address Ax̱adée's dental and nutritional needs are supported by the record.  And although Petra is correct that the risks to the child's health posed by the foster parent in *Taryn M.* were even greater than the risks in this case, Petra's failure to obtain treatment for Ax̱adée's substantial dental decay and failure to provide sufficient nutrition amount to clear and convincing evidence that Petra was an unsuitable foster parent.[17]

---

[13]     *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 187 (Alaska 2009) (quoting *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994)).

[14]     *Taryn M.*, 529 P.3d at 533.

[15]     *Id.* at 532.

[16]     *Id.* at 533.

[17]     Because we agree that Petra was an unsuitable foster parent, we do not reach the parties' arguments about whether there was good cause to depart from

**A.** **The Superior Court Did Not Clearly Err By Finding That Petra Failed To Address Ax̱adée's Dental And Nutritional Needs.**

**1.** **Dental needs**

The superior court found that Petra "did not address [Ax̱adée's] dental needs." It cited Petra's testimony that she knew about Ax̱adée's poor dental health, told a Washington child protection worker about the dental issues, received a treatment plan, chose not to follow the treatment plan, and still "did not arrange for any alternative care." It found that upon Ax̱adée's relocation to Alaska "a dentist pulled five teeth, capped three others, filled ten cavities, and treated an abscess in her gums." Ax̱adée's dental issues "were so extensive" that she "had to undergo general anesthesia during the surgery." Because Petra failed "to address these essential issues despite OCS's efforts to work with her," OCS had "little choice but to remove [Ax̱adée] and place her with a different caregiver."

Petra argues that OCS did not present clear and convincing evidence that she failed to address Ax̱adée's dental needs. She argues that Ax̱adée's cavities "did not affect" her "day-to-day life" and that "no one documented or even mentioned a concern" about Ax̱adée's dental care, including "medical professionals, educators, the therapist, and many family friends." She also argues that OCS must not have been concerned about Ax̱adée's dental care because it never voiced concern about it until after removing her from Petra's care.

We review the trial court's factual findings for clear error.[18] Clear error exists "only when a review of the entire record leaves us with a definite and firm

---

ICWA's placement preferences. *See id.* at 530 ("[T]he good cause inquiry only arises if a 'suitable caretaker' exists.").

[18] *Jude M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 394 P.3d 543, 550 (Alaska 2017).

conviction that the superior court has made a mistake."[19] "Conflicting evidence is generally not sufficient to overturn a trial court's factual findings, and we will not reweigh evidence when the record provides clear support for a trial court's ruling."[20]

The record supports the court's finding that Petra failed to address Aҳ adée's pressing dental needs. Evidence presented to the court shows that Petra knew that Aҳ adée had dental issues while in her care. Notes from the home study that Washington child protection workers completed before approving Aҳ adée's placement state that Petra was "aware of the extensive dental work the children have received since they entered care." Petra testified that the dentist told her that "there were some cavities" at Aҳ adée's first dentist appointment two weeks after she arrived in Seattle. Supervision reports from Washington child protection workers spanning nearly a year note that Petra reported in each meeting that Aҳ adée needed dental treatment for visible cavities. Numerous medical records also indicate that providers observed Aҳ adée's poor dental health.

But Petra never got Aҳ adée treatment for her cavities. She testified that she thought the silver caps the dentist recommended were "a severe treatment" and that she was concerned about the treatment's efficacy and stigma against Native children with silver caps.[21] Petra argues that she sought alternative treatments, looked for insurance, and "requested an increased subsidy from OCS to pay for insurance that would cover [Aҳ adée's] dental care." But there is no evidence that Aҳ adée ever

---

**19** *Id.* (quoting *David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 P.3d 767, 774 (Alaska 2012)) (internal quotation marks omitted).

**20** *In re Macon J.*, 565 P.3d 215, 220 (Alaska 2025) (internal quotation marks omitted) (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 322 P.3d 842, 849 (Alaska 2014)).

**21** A foster parent's suitability should be considered "in light of the prevailing social and cultural standards of the Indian community." *Taryn M.*, 529 P.3d at 532. Petra does not argue that the superior court erred by failing to consider these standards, so we do not consider that issue.

returned to a dentist after her initial appointment upon arriving in Seattle nor could Petra identify other dentists she consulted. The superior court was not required to credit Petra's assertion that she tried to find alternative care when the record shows that Ax̱adée never received *any* follow-up dental treatment during the two years she spent in Petra's care.

Petra also minimizes Ax̱adée's dental health needs, asserting that medical professionals who came into contact with Ax̱adée failed to notice any acute dental needs, "other than visible cavities." But the superior court credited evidence in the record that shortly after being placed with Chastity, Ax̱adée had to receive significant, invasive treatment for "extensive, existing decay" and an abscess on her gums.[22] The OCS supervisor described the treatment as a "full dental mouth restoration." And while Petra argues that OCS was not concerned about Ax̱adée's dental health until after it had transferred her from Petra's home, Petra's decision not to get treatment for Ax̱adée's dental issues was still inappropriate regardless of OCS's actions while she had placement. We see no clear error in the superior court's finding that Petra failed to address Ax̱adée's "essential" dental needs.

### 2. Nutritional needs

The trial court found that Petra "failed to address serious dietary issues." It credited medical records as establishing that Ax̱adée's height and weight percentiles declined while placed with Petra and rapidly improved upon placement with Chastity. It called Petra's explanations for her lack of growth "unpersuasive" and noted that there was no "undiagnosed, complex condition" that explained Ax̱adée's failure to gain weight and height. It found that Petra "repeatedly manufactured unnecessary

---

[22]     Petra also argues that Chastity was not credible. But "it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence." *Tessa M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) (quoting *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001)).

restrictions on [Ax̱ adée's] diet, including an invented allergy to dairy products, a gluten restriction . . . [,] and an unsupported claim that [Ax̱ adée] could not tolerate tomatoes." It also found that Petra provided Ax̱ adée with fewer than the recommended calories per day, despite a physician's recommendation to provide more. The court concluded that the "simplest explanation" for Ax̱ adée's lack of growth was that Petra was not adequately nourishing her.

Petra disagrees. She primarily argues that the evidence could not support the trial court's finding that she was inadequately nourishing Ax̱ adée, disputing the court's findings that she "invented an allergy to dairy products," that she restricted gluten, or that she restricted Ax̱ adée's calories. But the record contains sufficient support for these findings.

First, the record supports the finding that Ax̱ adée's failure to grow while in Petra's care was due to inadequate nutrition. In March 2023, shortly after Ax̱ adée arrived in Seattle, her weight was in the thirtieth percentile and her height was in the twenty-seventh percentile based on CDC data for girls of similar age. During her time in Petra's care, she dropped dramatically on the growth curve. Seven months later, in October 2023, Ax̱ adée's measurements decreased to the eighteenth percentile for weight and sixteenth percentile for height. Six months later, in April 2024, Ax̱ adée was in the eleventh percentile for weight and the fourth percentile in height. And by October 2024, just six months later, her weight had further dropped into the fourth percentile and her height was in the second percentile. While living with Petra between the ages of four and six, Ax̱ adée gained less than two pounds and grew less than two inches.

But after Ax̱ adée was moved to Chastity's home, she began to grow more quickly. The OCS caseworker testified that Ax̱ adée had "increased in size, height, and weight visibly" since arriving in Alaska. The pediatrician testified that since being in Chastity's care Ax̱ adée had "made catch up growth in both weight and height" — from

about the tenth percentile in weight to the twentieth percentile and from under the first percentile in height to the tenth percentile.

Ax̱adée's pediatrician concluded, based on his observations and Ax̱adée's medical records from Seattle that showed no indication of growth hormone deficiency, IBS, or celiac disease, that her poor growth while in Seattle was nutrition-related. Ax̱adée's therapist also agreed that "assuming that there were no medical interventions," the "clear indication" of this catch-up growth would be that she was now receiving the proper nutrition.

Second, the record supports the superior court's finding that Petra unduly restricted Ax̱adée's food intake. Petra repeatedly portrayed Ax̱adée as overeating, describing actions to "help [her] manage portions." Medical records note that Petra stated that she counted Ax̱adée's calories (though the record notes that "[i]t [was] not clear if calories [were] restricted") and testimony from a school worker corroborates her calorie-counting. Medical records also indicate that in October 2023, a nutritionist encouraged Petra to feed Ax̱adée "high calorie foods" and 1500-1600 calories a day. But the records indicate that almost a year later, Petra was feeding Ax̱adée less than the recommended amount. While the Washington investigator who followed-up on OCS's protective services report noted that Ax̱adée "did not disclose any information to indicate that she wasn't fed or that food was being withheld," the investigator also described Petra as having "strict rules in her home surrounding snacks and asking for food[,] [and] when these rules are broken, the children are yelled at, sent to their room, or slapped on the hand." Upon arriving in Alaska, Ax̱adée was scared and "very concerned about the food she was eating." She also told a Washington child protection worker that "there was a rule in [Petra's] home, that if she had more and more food, her

tummy would get bigger."  All of this evidence supports the trial court's finding that Petra restricted Ax̱adée's food intake.[23]

Third, the trial court's finding that these restrictions were unnecessary is also supported by the record.  Both the pediatrician and Chastity testified that Ax̱ adée had not exhibited any signs of food intolerances or allergies when allowed to consume food without restriction.  Their testimony specifically noted that Ax̱ adée experienced no reaction to dairy products.  While Petra argues that she based her decision to restrict dairy on "very real experiential data," the trial court in its role of factfinder was entitled to weigh her testimony against the testimony of Chastity and the pediatrician.[24]  There was sufficient evidence to support its conclusion that Ax̱ adée had no lactose intolerance or dairy allergy.  Petra also argues that restrictions were necessary to help Ax̱ adée address food insecurity behaviors.  But Chastity's testimony that these behaviors lessened when Ax̱ adée was allowed to consume an unrestricted diet also supports the court's finding that Petra's food restrictions were unnecessary.

We do not reweigh evidence when the record provides clear support for a trial court's ruling,[25] and conflicting evidence is usually insufficient to overturn those

---

[23]    In reaching this conclusion, the superior court rejected the conclusions of a Washington investigation into Petra's alleged neglect of Ax̱ adée, which determined that the allegations of neglect based on Petra's dietary choices were "unfounded."  The court found the report's conclusions about whether Petra restricted Ax̱ adée's diet both internally contradictory and unpersuasive.  Because the superior court has the role of factfinder and judge of credibility, we see no clear error in its decision to give more weight to the witness testimony presented at the hearing than to Washington's report. *See id.*

[24]    *Tessa M.*, 182 P.3d at 1114.

[25]    *Id*.

factual findings.[26] Ample evidence supported the trial court's finding that Petra failed to adequately nourish Ax̱adée. We see no clear error on this point.

**B.   The Court Correctly Determined That Petra Was Unsuitable Because She Failed To Address Ax̱adée's Dental And Dietary Needs.**

The superior court's findings that Petra failed to treat Ax̱adée's extensive dental decay and failed to give her enough food to eat are clear and convincing evidence that Petra was not a suitable foster parent. Petra argues that our previous decisions involving foster parent suitability involved children with much more serious medical needs, suggesting that only in such extreme cases could a foster parent be deemed unsuitable for purposes of ICWA's placement preferences. And she maintains that she acted as a "reasonably prudent parent" would, the standard for foster parent decision-making under Alaska law.[27] Neither argument is persuasive.

Our prior cases establish a rule that a foster parent's unwillingness to meet a child's significant medical needs makes the foster parent unsuitable. In *Taryn M.*, we held that a relative foster parent's "unwilling[ness] to abide by the requirements necessary to care for [her foster child's] special medical needs . . . was clear and convincing evidence that she was an unsuitable caretaker."[28] The child in that case was especially fragile. She was recovering from a bone marrow transplant and was immunosuppressed, requiring a trip to the hospital for "even a normal fever" — a medical directive that the foster mother disregarded.[29] But our decision did not suggest that only such grave neglect of a child's health can make a foster parent unsuitable.

---

[26]   *See Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 450-51 (Alaska 2017).

[27]   AS 47.10.084(d).

[28]   *Taryn M. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 529 P.3d 523, 533 (Alaska 2023).

[29]   *Id.* at 526-28.

Rather, neglect of a child's basic health needs renders a foster parent unsuitable, even if it does not put the child in immediate danger. Such is the case here.

Ax̱adée's dental decay was extensive, longstanding, and required putting her under general anesthesia to treat.[30] Petra argues that Ax̱adée's condition must not have been so significant because OCS did not approve her proposal for more expensive alternative treatments than the silver caps the dentist recommended (and that Medicaid would cover). But OCS's unwillingness to pay for a more expensive alternative procedure does not mean that Ax̱adée's condition was minor. And Petra's decision to pursue *no* treatment for Ax̱adée when funding for her alternative proposal was denied supports the conclusion that she was not a suitable foster parent.

Likewise, Ax̱adée's growth slowed substantially while in Petra's care. Although there was no evidence indicating that Ax̱adée was permanently harmed, long-term undernourishment can cause long-term harm to physical and mental health. In this case, evidence showed that Ax̱adée left Petra's home with a fear of eating. A foster parent who negligently or intentionally causes a child to suffer diminished growth due to undernourishment is not a suitable foster parent.[31]

---

[30] In past cases, we have taken OCS's concerns about similar dental issues seriously, including by identifying dental problems as a condition that could place a child in need of aid. *See, e.g.*, *Kim B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-13083, 2009 WL 225630, at *3 (Alaska Jan. 28, 2009) (noting dental neglect where child "had 'two large holes in his front teeth' and required four caps and ten fillings" and brother "also required extensive dental fillings"); *Bernadette K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, Nos. S-16334/16354, 2017 WL 2709738, at *1 (Alaska June 21, 2017) (noting neglect causing "rotten teeth"); *cf. Roy S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 278 P.3d 886, 888-89 (Alaska 2012) (describing "visible holes in the top teeth" as sign of neglect); *Yelena R. v. George R.*, 326 P.3d 989, 1001-02 (Alaska 2014) (per curiam) (noting concern about parent neglecting dental care).

[31] The superior court may find a child to be in need of aid if "conduct by or conditions created by the parent, guardian, or custodian have subjected the child . . . to

For the same reasons, Petra's argument that she satisfied the "reasonably prudent parent" standard, a provision of Alaska law intended to guide foster parents' decision-making,[32] falls flat. Alaska law gives foster parents the "right and responsibility to use a reasonable and prudent parent standard to make decisions relating to the child," which "include[s] decisions relating to the child's participation in age-appropriate or developmentally appropriate activities."[33] We question whether this provision applies to the facts of this case, as the law entrusts OCS with the "duty of providing the child with food, shelter, education, and medical care."[34] But even if it does apply, a "reasonably prudent parent" does not delay treatment for a child's extensive dental decay for more than a year. Nor does a "reasonably prudent parent" deny a child enough food to grow.

Because the superior court's findings amount to clear and convincing evidence that Petra was not a suitable foster parent for Aẋadée, we affirm its decision to allow OCS to place Aẋadée with Chastity despite her being a less-preferred placement under ICWA.

---

neglect." AS 47.10.011(9). "Neglect" is defined as "fail[ure] to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development." AS 47.10.014.

[32] AS 47.10.084(d).

[33] *Id.* This provision authorizes "decisions relating to the child's participation in age-appropriate or developmentally appropriate activities, including travel, sports, field trips, overnight activities, and extracurricular, enrichment, cultural, and social activities." *See Rosalind M. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 555 P.3d 505, 514 (Alaska 2024) (quoting AS 47.10.084(d)). Washington, where Petra was licensed, also authorizes foster parents to use a "prudent parent" standard, which is defined similarly. *See* WASH. REV. CODE § 74.13.710(3) (2025) (allowing foster parents to use prudent parenting standard to permit children to participate in "normal childhood activities").

[34] AS 47.10.084(a); *see also Rosalind M.*, 555 P.3d at 514.

## IV.    CONCLUSION

The superior court's placement review decision is AFFIRMED.